THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
PHILLIP R. JONES, Defendant-Appellant.

Fourth District   No. 4—92—0670

Argued May 11, 1993.—Opinion filed June 30, 1993.—Rehearing
denied July 29, 1993.

Norman J. Fombelle (argued), of Burger, Fombelle, Zachry & Rathbun,
P.C., of Decatur, for appellant.

Lawrence R. Fichter, State's Attorney, of Decatur (Norbert J. Goetten,
Robert J. Biderman, and Leslie Hairston (argued), all of State's Attorneys
Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Following a jury trial in the circuit court of Macon County,
defendant Phillip R. Jones was convicted of the offenses of theft by
deception (Ill. Rev. Stat. 1991, ch. 38, par. 16—1(a)(2)(A)) and offi-
cial misconduct (Ill. Rev. Stat. 1991, ch. 38, par. 33—3(c)). He now
appeals, claiming the evidence was insufficient to prove him guilty
beyond a reasonable doubt. We agree and reverse.

Defendant was a counselor with the Illinois Department of Re-
habilitation Services (IDORS). Charges brought against him
stemmed from an alleged sale to a Decatur business, California Cus-
tom Auto (Custom Auto), of State-owned equipment and a compres-

sor purchased by IDORS for use by one of defendant's clients who worked for Custom Auto. Defendant allegedly received $1,600 from Custom Auto and failed to turn the money over to the State.

Testimony at defendant's jury trial was as follows.

## STATE'S CASE

### *John Steven Dolan*

Dolan is administrator of field operations for IDORS. He is in charge of 50 offices around the State, with approximately 550 employees. He oversees the spending plan for the vocational rehabilitation program and is involved in formulating policy and the hiring and training of counselors. He has been with IDORS for 21 years. He was a counselor with IDORS at one time for 6½ years.

The vocational rehabilitation program assists people with disabilities. Counselors such as defendant decide whether people who apply are eligible for the program. They have the responsibility of developing a plan to vocationally rehabilitate them and to see that the plan is carried out. Defendant has been a counselor for about 15 years and works out of the Decatur office.

People's exhibit No. 1 was identified by Dolan as the case file for Ralph Wilkes, an IDORS client. The file contains documentation of Wilkes' eligibility, everything that has been done on rehabilitation, and all money spent on Wilkes. Defendant was Wilkes' counselor. Wilkes was accepted as an IDORS client in March 1990, and his vocational goal was to be an auto-body worker. He received his on-the-job training at Custom Auto in Decatur. As counselor, defendant had authority to authorize purchase of equipment for use by Wilkes and, in fact, did so. The process of making purchases for an IDORS client begins with the completion of an invoice voucher. This document is then sent to the State Comptroller, who causes a check to be issued to the named payee in the amount requested. Vouchers, as well as payee receipts, are kept in the case file.

Dolan identified several vouchers and receipts for items purchased for Wilkes. One was processed on August 13, 1990, for $1,372.14 to Scranton Paint and Auto Body as payee. There was also a receipt in the file from Scranton to Custom Auto for the same amount. Two vouchers to Mathias Body Shop as payee for $1,000 each, processed on September 25, 1990, for a 10-horsepower air compressor were also in the file. One voucher was cancelled on December 11, 1990, and the other changed to show the amount of $2,000, which was approved by an individual named C. Byerly. Over

defense counsel's objection, Dolan testified to circumstances surrounding what happened with cancellation of the one voucher. He stated the computer system processing vouchers will not process a voucher from a counselor for more than $1,000. The original $2,000 authorization for the air compressor had to be divided; it was later consolidated at a higher administrative level into one authorization for $2,000. There was also a receipt in the file dated August 9, 1990, from Mathias for $2,000 for a 10-horsepower air compressor. There were also vouchers in excess of $1,360 for equipment from Sears, Roebuck & Co.

Counselors are allowed to buy tools to benefit a client in his or her training that the client will be able to use on the job following training. For this reason, it is unusual to purchase an air compressor. Counselors usually purchase equipment either before the training program begins or immediately after. The equipment authorized for Wilkes was at the end of the program. It is also very unusual to spend $4,700 for equipment for one client.

Title to the property is in the State and remains there, although it may be assigned to the client after the program ends and it appears he or she is employed and will be able to use the equipment in employment. A form was in Wilkes' case file which advises clients that property purchased for their benefit belongs to the State unless it is later assigned to them. That form was dated October 16, 1990, was signed by Wilkes, and contains numbers from invoice vouchers used to purchase the equipment. It appears title was never assigned to Wilkes. There is no provision to assign title to the business where the client is working. Counselors are not authorized to transfer any property to the business itself.

Dolan identified case notes in the Wilkes file. One entry was dated August 30, 1990, and stated:

> "Also issued authorizations to pay for air compressor for training in the amount of $2000.00 (two $1000.00 auths) (owner of Custom Auto is paying 50% of this equipment. We have a statement signed by owner and counselor that equipment being purchased will be reimbursed to [I]DORS in the event that [I]DORS does not have any client there any longer or if the business closes."

Counselors are not authorized to make such arrangements. According to the records in the case file, the State paid the entire $2,000 for the air compressor. When a business closes or the IDORS client is no longer there, the State confiscates the equipment and attempts to use it for another client. It is taken to the

nearest IDORS office, which in this case would be the Decatur office. There are no documents in the Wilkes case file to indicate any equipment was returned there.

Dolan was shown an agreement on IDORS letterhead, signed by defendant and the manager of Custom Auto (Greg Powell), and dated September 26, 1990. That document stated training equipment was being purchased for Wilkes and that IDORS was paying 50% of the cost. It also stated that IDORS would be reimbursed by Custom Auto in the event the business should close or if no IDORS clients were there. Dolan testified that defendant would not have been authorized to make such arrangements, as IDORS pays 100% of the equipment cost.

Two checks drawn on the account of Custom Auto were admitted as People's exhibit No. 6. They are signed by Greg Powell and made payable to "Phillip R. Jones, Dist. 292." One check is for $1,000 and has the notation "for equipment"; the other is for $600 with the notation "for compressor" on it. Both are dated September 26, 1990, and defendant's signature is on the back of the checks in the endorsement area. Dolan testified that caseloads are identified by district numbers and that district No. 292 is where defendant was assigned at the Decatur office. There are no circumstances under which a check should be made payable to a counselor for services provided to a client—it should be made payable to the State or IDORS.

On cross-examination, Dolan testified he is assuming that "Dist." on the checks stands for "District." He admitted having no knowledge of what equipment was paid for by the $1,000 check to defendant. Neither check amount corresponds to the voucher figures about which he testified. Dolan had no first-hand knowledge of whether the State actually paid any of the $2,000 for the compressor or for any other equipment.

Dolan testified it is impossible for the State to make payment before receiving a voucher. It would have been substantially after September 25, 1990, that the State paid for the compressor. It normally takes approximately six weeks to process a voucher and issue the check, although it can take less time than that. Dolan was unable to explain why Mathias Body Shop would receipt for the purchase of a compressor on August 9, 1990, when the voucher for the compressor was not processed until September 25, 1990.

On redirect examination, Dolan testified the proper procedure is that "Receipt By Client" forms, such as the one signed by Wilkes on October 16, 1990, would be executed by the client after he has

received the equipment. The purpose of the form is to guarantee receipt by the client. All the numbers at the bottom of the form correspond to numbers on vouchers used to request purchase of equipment and the compressor. Although defendant did not sign the vouchers as approving authority, his name appears on all of them as the responsible counselor. The counselor arranges for purchase of equipment for his or her own client. It is unheard of for a counselor to buy equipment for another counselor's client. Nor is it the job of the supervisor.

### James L. Taylor

Taylor, a former part-owner of Custom Auto, testified he is awaiting sentencing in Federal court on a charge of possession of cocaine with intent to deliver. The other part-owner was John Ellis and, prior to their ownership, the owner was Ricky Evans. Evans sold the business to Taylor and Ellis in September 1990. They retained several employees, among them Gregory Powell and Ralph Wilkes. Powell told Taylor that Wilkes had been placed there by IDORS and that defendant was his counselor. Powell was general manager of the business and was authorized to sign business checks. There was a compressor there when Taylor took over the business. On or about September 26, 1990, he, Ellis, Powell, and defendant had a conversation about some equipment in the office of Custom Auto. Greg Powell said that Evans owed defendant some money for a compressor and other equipment, and Taylor said to pay the money back to defendant. At his and Ellis' direction, Powell wrote the two checks to defendant. Taylor also testified that on March 27, 1991, he turned the checks over to a State Police officer who had come to Custom Auto to get them.

On cross-examination, Taylor testified there was a large amount of equipment included in the purchase price of the business when he took over. When he checked in August 1990, a compressor was among the equipment. He learned that defendant had loaned Evans money to buy some of the equipment, and the checks issued to defendant were for repayment of the loan on this equipment.

### Rhonda Berberet

Berberet is an IDORS fiscal supervisor. It is her responsibility to keep records of deposits made to the IDORS account for the State. She identified a cash receipt ledger from September 4 through October 31, 1990, which includes checks received on the IDORS account. She records the date the check is sent to the

Comptroller by IDORS, the name of the person who sent the check, the check number and amount, and the receipt after deposit to the Comptroller's account. These records show no deposit received from defendant on the IDORS cash ledger for that time period.

### DEFENDANT'S CASE

#### *Ricky Evans*

Evans testified that he is currently under a conviction for conspiracy and is awaiting sentencing. He has known defendant for about 14 years. He opened Custom Auto in August 1989. Greg Powell was his manager and had authority to sign checks. Evans had to have air tools and an air compressor for the business. He borrowed part of the money to obtain equipment and other things from defendant in August 1989. In February 1990, the first IDORS client was placed with him. When he transferred the business to Taylor and Ellis in September 1990, he still owed defendant money. He transferred everything to the new owners, including the air compressor, air tools, and open accounts.

On cross-examination, Evans stated he pleaded guilty in Federal court to conspiracy to distribute cocaine. In 1988 he was found guilty of theft in Macon County. He pleaded guilty to charges in State court on the cocaine conspiracy. When he sold the business, items purchased by the State were in the shop. He does not know if one of the items purchased was an air compressor. Taylor and Ellis did not agree to pay his personal loan from defendant. Defendant loaned him $6,000 to start up his business, and he has paid back $1,500 to $1,600. He admitted telling police officers he had paid $1,200 or $1,300 back; he then stated he was not sure of the exact amount but that it would be between $1,200 and $1,600. He stated he had never paid 50% of the cost of any IDORS equipment.

### JURY VERDICT AND SENTENCE

The jury found defendant guilty on both counts. Defendant filed a motion for judgment *n.o.v.*, in the alternative, a new trial. That motion was denied. On August 4, 1992, the judge sentenced him to 30 months' probation on each count, with the sentences to run concurrently. As to the theft offense, defendant was ordered to pay restitution of $4,000 to IDORS. As to the official misconduct offense, defendant was ordered to pay a fine of $5,000, serve the first 60 days of his probation in the county jail, and perform 500

hours of community service. Defendant filed his notice of appeal on August 11, 1992.

## ANALYSIS

On review, a criminal conviction will not be set aside on grounds of insufficiency of the evidence unless the proof is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. The relevant question on review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Tye* (1990), 141 Ill. 2d 1, 13-14, 565 N.E.2d 931, 937, *cert. denied* (1991), 502 U.S. 833, 116 L. Ed. 2d 81, 112 S. Ct. 112.

Defendant concedes the State proved the following: (1) privately owned equipment and a compressor were in existence at Custom Auto prior to February 1990, the month in which Ralph Wilkes started his job there; (2) the equipment was purchased with funds loaned by defendant to Ricky Evans; (3) after February 1990, the State purchased miscellaneous equipment for use by IDORS clients at Custom Auto; (4) defendant was an employee of the State; (5) in September 1990, defendant received two checks drawn on the private account of Custom Auto for repayment of the loan made to Evans in 1989; and (6) it takes six weeks after a voucher is processed for the State Comptroller to issue a warrant authorizing payment of the amount requested.

Defendant believes the State failed to prove any sale of equipment or compressor by him to Custom Auto or that the State suffered any loss. He also insists the State did not prove the existence of the compressor. He states the only compressor shown to exist was the one purchased by Evans in 1989 with the loan from defendant, and he argues that if the State ever purchased a compressor, it was long after the September 26, 1990, checks were issued to defendant. He further argues there was no evidence of deceitful statements by him to anyone. He points out that the State's own witness, James Taylor, testified directly contrary to its theory that the checks were received for the sale of State property.

The State's response to these arguments does little more than generally assert that the evidence was sufficient to convict defendant. In the process, it misstates some of the evidence. For instance, the State argues that defendant submitted vouchers which contravened IDORS policy and procedure and that defendant had his two checks from Custom Auto made out in amounts which corresponded

to the vouchers. These two statements are not supported by the evidence. While Dolan testified the amount of equipment purchased for defendant's client was unusually high, there was no evidence that the requests were violative of any IDORS policy. In addition, the evidence showed defendant received two checks from Custom Auto, one for $1,000 which bore the notation "for equipment," and the other for $600 which bore the notation "for compressor." Neither of those amounts corresponds to vouchers placed in evidence by the State. The State also attempts in its brief to misconstrue Taylor's testimony, as the prosecution did at trial, by asserting that he testified he submitted the checks to defendant because he believed he was purchasing "the equipment" (presumably referring to the compressor and equipment at issue in this case), which defendant had no authority to sell. In fact, Taylor's testimony was unequivocal that he was repaying a loan made by defendant to Ricky Evans for equipment bought by Evans with the loan proceeds.

The paperwork surrounding purchase of the compressor was confusing. Originally there were two vouchers for $1,000 each. One was cancelled in December 1990 and the other amended to $2,000. They were processed on September 25, 1990. Dolan testified that it normally takes about six weeks to receive a warrant from the State for the amount requested. However, there was a receipt for a $2,000 compressor in Wilkes' case file from Mathias Body Shop, payee on the vouchers, which was dated August 9, 1990, long before money for the compressor was requested. Dolan testified he could not explain this. Defendant received the checks from Custom Auto on September 26, 1990, the day after the compressor vouchers were processed. The State presented no evidence to explain how defendant could sell a compressor to Custom Auto when it could not then have been in existence. Even assuming the "Receipt By Client" form signed by Wilkes in October 1990 is sufficient proof that the compressor was received by IDORS and transferred to Custom Auto, this does not answer the query just posed, since payment was made to defendant the month before this form was signed.

At trial, the prosecution made much of the September 26, 1990, agreement signed by defendant and Greg Powell, general manager of Custom Auto, stating that IDORS was paying half the cost of the compressor and equipment and, in the event Custom Auto should close or no IDORS clients were working at the business, Custom Auto would reimburse IDORS for its share of the cost. It was not made clear at trial whether this agreement was signed on

behalf of Ricky Evans, the former owner, or the new owners, James Taylor and John Ellis. The assistant State's Attorney asked Evans whether he had ever agreed with defendant to reimburse IDORS for half the cost of any equipment. Evans replied he had not. We note the case file shows Wilkes worked at Custom Auto until sometime in December 1990. If the agreement was signed on behalf of Taylor and Ellis, it remains a mystery why they would pay defendant for half the cost of the equipment and compressor at a time when Custom Auto was still in business and Wilkes was still an employee there. If it was signed on behalf of Evans, what would this tend to prove? The State failed to establish any connection between this agreement and the checks received by defendant. No attempt was made by the prosecution to explain any of these inconsistencies.

■■ Testimony of James Taylor, one of the State's key witnesses, wholly supported defendant's version of the events. No attempt was made by the prosecution to impeach Taylor's testimony. It is true that determinations of credibility of witnesses, the weight to be given to their testimony, and reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact. (*Tye*, 141 Ill. 2d at 13, 565 N.E.2d at 937.) However, even assuming that the jury chose to ignore Taylor's testimony, the other evidence, standing alone, was insufficient to support defendant's conviction.

■■ While defendant concedes, and we agree, that minor inconsistencies in the State's case may be ignored by the jury (see *People v. Brisbon* (1985), 106 Ill. 2d 342, 360, 478 N.E.2d 402, 410), the State's evidence against defendant in the instant case contains grave inconsistencies that are incompatible with the standard of proof beyond a reasonable doubt.

For the reasons stated, defendant's conviction and sentence are reversed.

Reversed.

KNECHT and COOK, JJ., concur.